Filed 4/24/15  P. v. Cangas CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAMIRO DANIEL CANGAS et al.,<br><br>    Defendants and Appellants. | B249124<br><br>(Los Angeles County<br>Super. Ct. No. MA057939) |

APPEAL from judgments of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed as to appellants, with directions as to Ozuna.

Richard M. Doctoroff, under appointment by the Court of Appeal, for Defendant and Appellant Ramiro Daniel Cangas.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant Raymond Zavala Ozuna.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Ramiro Daniel Cangas appeals from the judgment entered following his convictions by jury on count 1 – possession of a controlled substance for sale, count 5 – possession of a controlled substance with a firearm, and count 6 – false compartment activity, with each offense committed for the benefit of a criminal street gang. (Health & Saf. Code, §§ 11366.8, subd. (a), 11370.1, subd. (a), & 11378; Pen. Code, § 186.22, subd. (b)(1)). The court sentenced Cangas to prison for six years.

Appellant Raymond Zavala Ozuna appeals from the judgment entered following his convictions by jury on count 1 – possession of a controlled substance for sale, count 3 – possession of a firearm by a felon, and count 6 – false compartment activity, with the jury, having found Ozuna guilty on each of counts 1 and 6 on a conspiracy theory, finding as to each of counts 1 and 6 he conspired to commit specified crimes[1] and finding as to each of counts 1, 3, and 6 he committed the offense for the benefit of a criminal street gang. (Health & Saf. Code, §§ 11366.8, subd. (a) & 11378; Pen. Code, § 29800, subd. (a)(1); Pen. Code, § 186.22, subd. (b)(1)). The court found Ozuna suffered two prior felony convictions and sentenced him to prison for 28 years to life. (Pen. Code, § 667, subd. (d).) We affirm the judgments but direct the trial court to correct Ozuna's abstract of judgment.

### FACTUAL SUMMARY

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 (*Ochoa*)), the evidence established that in 2012, Los Angeles County Sheriff's deputies investigated possible narcotics activity at a house on East Cobb in Lancaster. In October 2012, deputies searched the house. It had been recently vacated, but evidence of narcotics activity was present, such as wiring for surveillance

---

[1] The specified crimes were "1. Transporting, selling or furnishing methamphetamine, in violation of Health and Safety Code Section 11379 [¶] 2. Possessing methamphetamine for sale, in violation of Health and Safety Code Section 11378 [¶] 3. Maintaining a place for controlled substance sale, in violation of Health and Safety Code Section 11366."

2

cameras and paraphernalia for growing marijuana. The occupants had moved to a house at 2833 West Milling in Lancaster.

About 5:30 a.m. on November 9, 2012, deputies, executing a search warrant at the Milling house, demanded entry. The deputies, hearing voices inside and hearing people running through the house, opened the front door. Appellants ran through the living room and around a corner. Los Angeles County Sheriff's Deputy Curtis Foster pursued them into the kitchen and detained them. Cangas's front pants pocket contained a set of keys, including a key to the front door of the house.

Silvia Brizuela exited the master bedroom, and Loriano Ruiz[2] and Betsy Pinto were in that bedroom. When detained, Ruiz removed a key to a black Honda from his pocket and tossed the key. Guestavo Omeido was hiding in a downstairs bedroom.[3] Between about 5:30 a.m. to 5:45 a.m., a deputy searched Brizuela. About 30 minutes later, Ozuna and Brizuela were in the back of a patrol car. The two were communicating excitedly. Both turned so their hands were close. Brizuela took something from Ozuna and put it in her pants. When searched at the Lancaster station, Brizuela removed from her pants a small plastic bag and gave it to the jailer. The bag contained 3.77 grams net weight of methamphetamine.

Deputies searched the Milling property. The master bedroom closet contained three plastic bags inside a man's tennis shoe. One of the three contained methamphetamine. Another of the three contained seven smaller plastic bags inside of which was methamphetamine. The third bag contained several smaller plastic bags. A folder was near the tennis shoe. The folder bore gang writings and had pockets labeled Dope, Profit, and Saving. The master bedroom contained three cell phones, at least two of which had text messages related to drug sales. That bedroom also contained a rental agreement bearing the names Sylvia Brizuela and Loriano Ruiz.

---

[2]  Ruiz's first name is sometimes referred to in the record as Lauriano; in this opinion we refer to his first name as Loriano.

[3]  Brizuela, Ruiz, Pinto, and Omeido, codefendants, are not parties to this appeal.

A downstairs bedroom (bedroom No. 5) contained a wallet inside of which was Omeido's driver's license. Two televisions were in said bedroom and a third television was in the bedroom's closet. Photographs depicted items recovered from bedroom No. 5 and other locations. The photographs included a photograph of a jacket. One of the jacket's pockets contained a plastic bag, inside of which were jewelry, rings, and necklaces.

A closet in an upstairs bedroom (bedroom No. 2) contained a pair of jeans. The jeans contained an Iphone and a wallet inside of which was Ruiz's Nevada identification card. The right coin pocket in the jeans contained methamphetamine. The bedroom also contained a spoon and push rods, a Samsung phone, and memory cards. The bedroom further contained numerous papers bearing the letters VNE (discussed *post*) and the name Shadow. Artwork bearing Ozuna's signature and the letters "P.C.P." (discussed *post*) were in the bedroom. The bedroom also contained 12 shotgun shells.

Two Hondas, including the previously mentioned black Honda, were in the garage. Brizuela was the registered owner of the black Honda, and Los Angeles County Sheriff's Deputy Scott Woods, the investigating officer in this case, testified he believed Brizuela was the registered owner of the second Honda, although Woods was uncertain. An envelope bearing the name Loriano was on top of the center console of the black Honda. The envelope contained a card stating, "to Shadow from Silvia."
A small plastic bag was inside the card, and the bag contained $100, in $20 bills, and methamphetamine. A cell phone with a home screen that said Betsy was under the front passenger seat. Several messages on the cell phone were indicative of street-level narcotics sales.

A hidden compartment containing a safe was inside the front passenger seat of the black Honda. The safe held three plastic bags containing methamphetamine, and also held a digital scale, pay/owe sheets, and empty Ziploc bags. The driver's seat contained a secret compartment, and a leather bag was in the compartment. A shotgun containing "seven rifle slug shotgun rounds" was "sitting" on the garage wall. During booking,

4

appellants and Pinto indicated they were unemployed, Ozuna and Pinto said their address was the Milling address, and Cangas said he stayed there. Cangas had a Nevada driver's license. A criminalist determined the substances recovered from the Milling house were 49.07 grams of methamphetamine and .76 grams of cocaine base.

Woods, an expert in possession of narcotics for sale, opined the above methamphetamine in the Milling house was possessed for sale.[4] Based on information in the phones recovered from the Milling house, Woods determined the owners of the phones were Cangas, Brizuela, Ruiz, and Pinto. Text messages on phones were consistent with narcotics sales. Woods also testified as follows. Brizuela and Ruiz were running the operation, appellants and Pinto were helpers, and Cangas and Pinto were being recruited to deliver narcotics. Cangas and Pinto were each 19 years old and, in a gang environment, each would be eager to prove his or her name. Cangas, in contrast with Pinto, was less likely to be robbed. According to Woods, the pay/owe sheets referred to Raymond paying $40 for 1/32 ounce of methamphetamine. Woods assumed Raymond was Ozuna. Another entry on a pay/owe sheet referred to "Danny aka Shadow" and "Varrio Nueva, Danny aka Shadow." The entry showed this person bought $20 worth of drugs. Woods believed this person was Cangas.

Los Angeles County Sheriff's Detective Daniel Welle, a gang expert, testified at the 2013 trial, inter alia, as follows. Welle had been a deputy for over 13 years. After working four years in the jail system, he was assigned to patrol in East Los Angeles for six months, to the Palmdale station for about a year, to the Lancaster station for three years, then, in 2008, to his current gang unit.

---

[4] Woods based his opinion on numerous facts, including the facts there was a fairly large amount of recovered narcotics, the majority of the narcotics were packaged in individual bags, deputies recovered several scales with white residue as well as several pay/owe sheets, and a vehicle had two secret compartments, one containing methamphetamine, and both containing pay/owe sheets. His opinion was also based on the facts there were several text messages involving narcotics sales, deputies recovered a loaded shotgun, and deputies recovered a VNE folder with the words Profit and Drugs on the folder.

5

According to Welle, Lancaster and Palmdale did not have an entrenched gang culture and instead were a "transit gang area." Gangs in the area primarily originated elsewhere. Welle was familiar with the Varrio Nueva Estrada gang (VNE). (We italicize below some of the facts pertaining to Cangas's claim, discussed *post*, that there was insufficient evidence VNE was an "ongoing organization, association, or group of three or more persons" for purposes of the gang enhancements.) *Welle contacted the gang when he was working in the jail*. Moreover, when Welle was on patrol in East Los Angeles, his training officer made it a point to go to Varrio Estrada projects and give Welle "a history on them because *we frequently dealt with them*." (Italics added.)

During direct examination, the prosecutor asked if Welle had a sense of how many members were currently in the gang. Welle testified VNE was a multigenerational gang that had been around since the 1970's, and it was hard to provide an exact number. Welle had read probably about *100 to 200 reports involving VNE. He had written 20 to 30 reports specifically involving VNE members*. Welle testified, "*In East L.A., I contacted them more frequently. Over my career in patrol, I've probably contacted around 50 different members*." (Italics added.) Welle really began dealing with *VNE members* when he went to the Lancaster station and, when he started working in Lancaster, he encountered *the Primeros clique*. The Primeros clique was a Lancaster clique that *also* had *members* who lived in Rosamond. The gang previously, and at the time of Welle's testimony, was under a *gang injunction* and could not congregate in the East Los Angeles projects.

The prosecutor asked Welle to describe, in his opinion, "the primary activities of . . . the VNE gang." Welle replied, "It would be assaults, starting off with just basic assaults on the street; be it a street robbery, just a fight with rivals, all the way up to murder and narcotics sales." Later during direct examination, the prosecutor asked if Welle could provide "some sort of estimate of the subset of VNE." Welle replied, "in Lancaster –in the Palmdale area, over the last five year period, there are about 25, I believe, field identification cards filled out for different VNE gang members." The

6

following then occurred: "Q *So your number would be a minimum of 25*? [¶] A *Yes*; that have been either living here or passed through here from different – that lived in different areas that could have lived back in East L.A. or Montebello." (Italics added.)

Welle indicated Cangas had multiple VNE-related tattoos and was known as Little Shadow. Deputies recovered, from the Milling house, artwork done by Ozuna, and Welle testified it had "lots of tagging on it indicating P.C.P." The initials "P.C.P." stood for the Pure Chicano Pride gang. Welle opined Ruiz was Shadow. Rudy Escargega committed robbery in May 2010, Roger Gutierrez committed robbery in August 2010, and both were VNE members. The possession of methamphetamine in this case was done for the benefit of, at the direction of, or in association with, VNE. A person could not stay at a gang house where drugs were being sold without "putting in . . . work" because security was important to the gang members selling drugs.

Appellants presented no defense witnesses. We will present additional facts below where pertinent.

## ISSUES

Cangas claims (1) insufficient evidence supports his convictions, (2) insufficient evidence supports the gang enhancements, (3) the court committed instructional error as to the gang allegations, (4) he was denied effective assistance of counsel, (5) cumulative error occurred, and (6) his sentence constituted cruel and unusual punishment. Cangas also asks this court to review the sealed *Hobbs*[5] attachment to a search warrant issued in this case. Ozuna claims (1) the court committed instructional error as to counts 1 and 6, (2) the court committed instructional error as to count 3, (3) insufficient evidence supports the gang enhancements, (4) the court abused its discretion by failing to dismiss one of his strikes, (5) his abstract of judgment must be corrected, and (6) cumulative error occurred.

---

[5] *People* v. *Hobbs* (1994) 7 Cal.4th 948 (*Hobbs*).

7

1. *Sufficient Evidence Supports Cangas's Convictions.*

Cangas claims insufficient evidence supports his convictions. We disagree. Cangas concedes as to all of his convictions, "[t]he jury might have found [Cangas] guilty of those charge [*sic*] based on the conspiracy theory, . . . As part of a conspiracy, Cangas could be vicariously liable on the basis of Brizuela's and Ruiz's possession and use." We need not reach the issue of Cangas's liability under a conspiracy theory. However, we accept, as to counts 1, 5, and 6, his concession concerning "Brizuela's and Ruiz's possession and use."

Indeed, in light of the facts set forth in our Factual Summary, there was substantial evidence Brizuela and/or Ruiz possessed and/or used the methamphetamine in the house and garage, and that Brizuela possessed methamphetamine in the back of the patrol car, and we will not repeat that evidence here. Accordingly, we consider below whether there was substantial evidence Cangas, as a direct perpetrator of, and/or aider and abettor to, the possession and/or use of methamphetamine by Brizuela and/or Ruiz, committed the offenses at issue in counts 1, 5, and 6.

The court, using CALJIC Nos. 12.01, 12.52, and 12.38, instructed the jury as to counts 1, 5, and 6, respectively, that possession was an element of those counts. The court, using CALJIC Nos. 12.01 and 12.52 as to counts 1 and 5, respectively, told the jury possession included constructive possession. Each of those two instructions stated constructive possession required a person "knowingly exercise control over or right to control a thing, either directly or through another person or persons." There is no dispute this is a correct statement of the law. Those instructions also indicated persons could share constructive possession.

In the present case, there was ample evidence Brizuela and/or Ruiz were engaged in a methamphetamine sales operation at the Milling house. Moreover, there was substantial evidence as follows. About 5:30 a.m. on November 9, 2012, after deputies demanded entry into the Milling house, people were heard running inside. Deputies

8

entered and Cangas ran through the living room, around a corner, and into the kitchen. This was evidence of Cangas's access to locations in the house. Indeed, Cangas physically possessed a key to the entire house. During booking, Cangas said he stayed at the house. Welle testified a person could not stay at a gang house where drugs were being sold without "putting in . . . work," because security was important to the gang members selling drugs. Cangas's cell phone, found in the Milling house, contained text messages consistent with narcotics sales. This was evidence of Cangas's participation in the methamphetamine sales and smuggling operation.

In the case of *In re Z.A.* (2012) 207 Cal.App.4th 1401, the court stated, "By presenting evidence that Z.A. participated in a drug-smuggling operation . . . , the People presented sufficient evidence from which a reasonable fact finder could find that Z.A. exercised, at a minimum, constructive possession of the marijuana." (*Id.* at p. 1427.) In light of all the evidence in this case, we conclude there was sufficient evidence Cangas constructively possessed all of the methamphetamine in this case.

Possession of narcotics constitutes substantial evidence the possessor knew of its narcotic nature. (*People v. White* (1969) 71 Cal.2d 80, 83; *People v. Eckstrom* (1986) 187 Cal.App.3d 323, 331 (*Eckstrom*).) Knowledge of the presence of contraband and its narcotic content may also be inferred from a defendant's conduct and statements at or near the time of the defendant's arrest. (*Eckstrom*, at p. 331.) Woods testified Brizuela and Ruiz were in charge of the operation, Cangas was a helper, and he was being recruited to deliver narcotics.

Further, there was ample evidence, including Woods's testimony (see fn. 4, *ante*), that any possession of methamphetamine was for sale. Cangas's flight when deputies were executing the search warrant provided evidence of consciousness of guilt as to all of his alleged crimes.

9

Further still, there was ample evidence the crimes committed in this case involved the VNE gang, of which Cangas was a member, and that he was participating as such. Woods testified Cangas was 19 years old and, in a gang environment, would be eager to prove his name. Welle's opinion concerning Cangas's affiliation with VNE was based in part on photographs depicting Cangas with Ozuna and Ruiz. Welle opined Ruiz sponsored or brought Cangas into VNE. A photograph depicted Cangas making a "VN" hand sign, Ruiz making an "E" hand sign, and Ozuna making a hand sign simulating a gun pointed to his head. Welle opined the methamphetamine possession in this case was done for the benefit of, at the direction of, or in association with, VNE. He also opined to the effect the activity in this case promoted or furthered VNE's activity because narcotics sales were the number one producer of income for gangs.

We hold there was sufficient evidence supporting Cangas's convictions for possessing methamphetamine for sale (count 1), possessing a controlled substance with a firearm (count 5), and false compartment activity (count 6), as a direct perpetrator in constructive possession of the respective contraband, and/or as an aider and abettor. (*Ochoa*, *supra,* 6 Cal.4th at p. 1206.)

2. *Sufficient Evidence Supported the Gang Enhancements as to Cangas.*

Cangas claims insufficient evidence supports the Penal Code section 186.22, subdivision (b) gang enhancements because there was insufficient evidence (1) of the "ongoing organization, association, or group of three or more persons" element of subdivision (f), (2) of the "primary activities" element of subdivision (f), and (3) "the drug operation was gang-related." As to his above "ongoing organization" argument, he maintains the evidence "showed that VNE, or the Primeros-Newtown clique, had at most two active members [Cangas and Ruiz] during the time period of the alleged drug conspiracy." We reject Cangas's claim.

10

First, in our Factual Summary, we italicized some of the pertinent facts which, we conclude, establish VNE was an "ongoing organization, association, or group of three or more persons." Second, "[t]he phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. . . . [¶] Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. *Also sufficient might be expert testimony*[.]" (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323-324, last italics added.) There was sufficient evidence of the "primary activities" element of Penal Code section 186.22, subdivision (f). (Pen. Code, § 186.22, subds. (e)(2) [robbery], (3) [unlawful homicide], & (4) [narcotics sales] & (f).)

Third, Welle opined the possession of methamphetamine in this case was done for the benefit of, at the direction of, or in association with, VNE, and the activity in this case promoted or furthered VNE's activity because narcotics sales were the primary source of income for gangs. There was ample evidence supporting his opinion. When a crime is committed for the benefit of, at the direction of, or in association with, a criminal street gang (as Welle effectively testified these crimes were) the crime is gang-related. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) There was sufficient evidence supporting the gang enhancements.[6]

3. *No Instructional Error Occurred as to Cangas Regarding Gang Enhancements.*

Cangas claims the trial court erred by giving, on the one hand, CALJIC No. 2.51 on motive and, on the other, CALJIC Nos. 17.24.2 and 17.24.3. First, he argues CALJIC No. 2.51 instructs "[m]otive is not an element of the crime charged and need not be shown," while CALJIC Nos. 17.24.2 and 17.24.3 teach motive is an element. Citing

---

[6]    In part III of the argument in Ozuna's opening brief, Ozuna, like Cangas, argues there was insufficient evidence establishing VNE was an "ongoing organization, association, or group of three or more persons." Our analysis above applies to Ozuna as well.

*People v. Maurer* (1995) 32 Cal.App.4th 1121 (*Maurer*), he maintains CALJIC Nos. 17.24.2 and 17.24.3 teach motive is an element because CALJIC No. 17.24.2 states an essential element of the gang allegation is the crime was committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members" and CALJIC No. 17.24.3 required the jury to consider specified evidence for the limited purpose of determining whether crimes were committed with the above quoted specific intent.

We reject Cangas's argument. Motive and intent are separate and disparate mental states, and the words are not synonyms. Motive describes the reason a person chooses to commit a crime. That reason, however, is different from a required mental state such as intent. *Maurer* does not compel a contrary conclusion. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504; *People v. Fuentes* (2009) 171 Cal.App.4th 1133, 1139-1140.) Moreover, CALJIC No. 2.51 pertains to motive and the crime charged. CALJIC Nos. 17.24.2 and 17.24.3 pertain to gang enhancements. An enhancement is not a crime. (*People v. Vorbach* (1984) 151 Cal.App.3d 425, 430.) Finally, in light of our analysis in part 1 of our Discussion, we conclude there was overwhelming evidence Cangas had the specific intent required for the gang enhancements; therefore, any instructional error was harmless. (Cf. *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

Cangas argues the trial court erred by failing to instruct he could not vicariously have the specific intent required for the gang enhancements. That is, Canvas argues he cannot, as a conspirator, be liable for the gang enhancements unless he subjectively harbored the "specific intent to promote, further, or assist in any criminal conduct by gang members" within the meaning of Penal Code section 186.22, subdivision (b)(1), and he maintains it is irrelevant that a coconspirator's harboring of that specific intent was a natural and probable consequence of the conspiracy. We reject the argument.

12

In part 1 of our Discussion, we concluded there was sufficient evidence Cangas was guilty on counts 1, 5, and 6 as a direct perpetrator and/or as an aider and abettor, i.e., apart from any conspiracy theory. That analysis also demonstrates there was overwhelming evidence Cangas personally harbored the requisite specific intent for purposes of the gang enhancements. Accordingly, even if the trial court erred by failing to instruct that Cangas could not vicariously have the specific intent required for the gang enhancements, the instructional error was harmless under any conceivable standard. (Cf. *Chapman*, *supra,* 386 U.S. at p. 24.) Ozuna makes similar arguments in part I.B. of his opening brief, and we reject them as well.

4. *Cangas Was Not Deprived of Effective Assistance of Counsel.*

On March 19, 2013, voir dire of prospective jurors began during the trial of appellants and Pinto. The court questioned prospective jurors that day, and the examination, which sought standard information, comprises about 179 pages of the reporter's transcript.

On the morning of March 20, 2013, the trial court began proceedings by advising Cangas as follows outside the presence of the prospective jurors. Cangas's trial counsel, Attorney Martin Crumblish, had called and informed the court that morning Crumblish could not appear that day due to illness. Crumblish talked to Attorney Wayne Redmond, Ozuna's trial counsel. There were 75 prospective jurors. The court stated, "we obviously would like to get the jury picked rather than make them come back."

The court also advised as follows. Crumblish and Redmond agreed that, if it was acceptable to Cangas, Redmond would stand in for Crumblish that day, merely for purposes of jury selection. Redmond would represent appellants that day. Crumblish expected he would return at the start of trial, but did not want to delay jury selection. The court asked if that was acceptable to Cangas, and he replied yes.

13

Jury selection resumed that morning. Attorney Charles Anderson, Pinto's counsel, conducted voir dire, and his examination comprises three pages of the reporter's transcript. Redmond then conducted voir dire, and began by stating, "for purposes of today I'm two people. Mr. Crumblish is unable to be here, so I'm standing in for Mr. [Cangas's] attorney as well." Redmond's examination comprises 30 pages of the reporter's transcript. The prosecutor's subsequent voir dire comprises 30 pages of the reporter's transcript. All parties later passed for cause, and appellants and Pinto exercised joint and individual peremptories. On March 20, 2013, the parties accepted the panel and the jury was sworn. From March 21, 2013, through March 29, 2013, inclusive, the parties presented evidence at trial and Crumblish represented Cangas.

On March 26, 2013, the prosecutor filed a motion seeking clarification. The motion noted Redmond's joint representation of appellants during voir dire on March 20, 2013, and asked that the court secure a written waiver of both Cangas's right to his own counsel, and appellants' rights to unconflicted counsel. On March 29, 2013, the court indicated it did not know why the prosecutor had filed the motion, and the prosecutor lacked standing. The court recounted what had happened on March 20, 2013, then indicated as follows. The entire matter had been on the record and had been resolved. The court took a personal waiver from Cangas. Cangas had been quite happy to have jury selection proceed, as opposed to making 75 prospective jurors return the next day.

The court asked Crumblish if he was satisfied, and Crumblish replied yes. Crumblish added, "In fact, the Court -- through the court officer -- outlined the procedure that was going to be followed. I agreed with it to the letter and I later determined that, in fact, it had been done; yes." The court asked Redmond if he was satisfied, and he replied yes. The court asked Cangas if he was "still okay that . . . all that happened," and he replied yes. The court stated, "Thank you. We're all okay." On April 3, 2013, the jury began deliberating and, on April 4, 2013, the jury reached its verdicts.

14

Cangas claims he was denied his right to unconflicted counsel; therefore, he was denied effective assistance of counsel. Sixth Amendment violations based on conflicts of interest are ineffective assistance of counsel claims, and they generally require a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different. (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).)[7]

"In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest '*that affected counsel's performance*—as opposed to a mere theoretical division of loyalties.' [Citations.] '[I]nquiry into actual conflict [does not require] something separate and apart from adverse effect.' [Citation.] 'An "actual conflict," for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.' (*Ibid.*)" (*Doolin*, *supra,* 45 Cal.4th at pp. 417-418.)[8]

---

[7] In *People v. Mroczko* (1983) 35 Cal.3d 86 (*Mroczko*), our Supreme Court stated, "While the right to conflict-free counsel may generally be waived [citations], waivers of constitutional rights must, of course, be 'knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.' [Citation.] No particular form of inquiry is required, but, at a minimum, the trial court must assure itself that (1) the defendant has discussed the potential drawbacks of joint representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of joint representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right." (*Mroczko*, at p. 110.) We need not reach the issues of whether the trial court complied with *Mroczko* and obtained from Cangas a valid waiver of his right to unconflicted counsel. Even if Cangas did not waive his right to unconflicted counsel, we conclude *post* that no ineffective assistance of counsel occurred. That is, we conclude the record fails to demonstrate (1) Redmond labored under an actual conflict of interest that affected his performance and (2) any such actual conflict was prejudicial.

[8] Conflict of interest claims under our state Constitution are resolved under the Sixth Amendment standard. (*Doolin*, *supra,* 45 Cal.4th at pp. 419-421.)

15

In *Doolin,* our Supreme Court stated, "This court has suggested that a determination of whether counsel's performance was 'adversely affected' under the [Sixth Amendment] 'requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. . . . But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must . . . examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission." (*Doolin*, *supra,* 45 Cal.4th at p. 418.)

Cangas claims a conflict of interest existed because (1) there was evidence a cell phone linked to Cangas contained messages indicating he was selling drugs but there was no such evidence as to Ozuna, (2) Ozuna had a serious criminal record but Cangas had no criminal record, (3) joint representation of appellants by Redmond signaled a connection between appellants and that their interests were aligned, and (4) Crumblish's absence during jury voir dire precluded him from hearing prospective juror's responses to questioning, and from using peremptory challenges to "get a feel for the jury."

However, we have examined the record of jury voir dire. We have found no actual conflict of interest that affected counsel's performance, and Cangas fails to point to any specific instance of such a conflict in the jury voir dire. Cangas has failed to demonstrate that actions omitted (e.g., questions not asked, peremptory challenges not exercised) would likely have been made by counsel who did not have a conflict of interest. Refraining from questioning during jury voir dire can be an informed tactical decision. (*People v. Freeman* (1994) 8 Cal.4th 450, 485-486.) Moreover, "[b]ecause the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process." (*People v. Montiel* (1993) 5 Cal.4th 877, 911.)

16

Cangas has similarly failed to demonstrate joint representation of appellants by Redmond signaled a connection between appellants, and signaled their interests were aligned, with the result Cangas received ineffective assistance. A signaling of connection and alignment of interests occurs in some sense every time one attorney represents multiple defendants. However, "[m]ultiple representation of criminal defendants is not per se violative of constitutional guarantees of effective assistance of counsel." (*Mroczko, supra,* 35 Cal.3d at p. 103.)

Crumblish's absence would have resulted in his not hearing prospective juror's responses, and not getting a feel for the jury, whether or not Cangas had been represented by Redmond or another attorney. This point is really a right to counsel claim. However, Cangas was not completely denied the right to counsel during jury voir dire; Redmond represented him. Cangas neither contends nor demonstrates Redmond entirely failed to subject the prosecution's case to meaningful adversarial testing. Cangas has failed to demonstrate actual prejudice. (Cf. *People v. Streeter* (2012) 54 Cal.4th 205, 231-233; *People v. Benavides* (2005) 35 Cal.4th 69, 87.) Redmond's joint representation of appellants for one day during jury voir dire did not deny Cangas his right to counsel or constitute constitutionally-deficient representation.

Finally, any constitutionally-deficient representation of Cangas was not prejudicial in light of the facts jury voir dire occurred during a single day, Crumblish represented Cangas during the subsequent proceedings, there was overwhelming evidence of Cangas's guilt, and the jury, by its verdicts, clearly gave individualized focus to the charges of each appellant.[9]

---

[9]    In light of our previous discussion, we reject Cangas's claim cumulative prejudicial error occurred.

5. *Cangas's Sentence Was Neither Cruel nor Unusual Punishment.*

At the May 20, 2013 sentencing hearing, the court indicated it had read the probation report and the parties' sentencing memoranda. The court sentenced Cangas to prison for an unstayed term of six years. This consisted of a three-year middle term for possession of a controlled substance for sale (count 5), plus three years for its gang enhancement. The court stayed sentences on counts 1 and 6 pursuant to Penal Code section 654.

Cangas claims his prison sentence was cruel and/or unusual punishment for purposes of the federal and state Constitutions. He waived the issue by failing to object to his sentence on either of those grounds below. (Cf. *People v. Benson* (1990) 52 Cal.3d 754, 786, fn. 7; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.) Moreover, as to the merits, Cangas "has failed to show that this case and this defendant is that 'exquisite rarity' [citation], an instance of punishment which offends fundamental notions of human dignity or which shocks the conscience." (*People v. Kinsey* (1995) 40 Cal.App.4th 1621, 1631.) No constitutional violation occurred.

6. *The Trial Court Properly Denied Cangas's Motion to Quash and/or Traverse the Search Warrant.*

The nonconfidential record reflects as follows. On January 10, 2013, Brizuela filed a "motion to quash and/or traverse search warrant." The motion pertained to a search warrant issued on November 8, 2012, by Los Angeles County Superior Court Judge Thomas R. White and commanding the search of the Milling property, Brizuela, a male Hispanic named Shadow, and various vehicles including a black Honda. The warrant indicated, "*Hobbs* sealing approved." On January 30, 2013, the People filed a memorandum opposing the motion. A copy of a search warrant is attached to the memorandum and there is no dispute said search warrant is the one at issue.

The warrant was supported by an affidavit that we summarize as follows. The affiant, Woods, an expert in narcotics sales, received information in October and November 2012 from confidential informants that they were routinely purchasing methamphetamine from Brizuela at her house at 552 East Cobb, and she was storing methamphetamine there. Brizuela employed a male Hispanic driver, whose moniker was Shadow, to deliver methamphetamine. Vehicles used included a black Honda and gold Infinity, and Brizuela stored methamphetamine in the vehicles.

In October 2012, deputies conducted surveillance of the Cobb address and saw a person, matching the description of the above male Hispanic, leave and return to the Cobb address several times in a gold Infinity. This behavior was indicative of street level narcotics transactions. On one occasion the male Hispanic engaged in countersurveillance driving and he drove to a Walmart parking lot. He engaged in a hand-to-hand transaction with someone, and the two never entered the store. The male Hispanic returned to the Cobb address and engaged in countersurveillance driving and conduct. The above black Honda, registered to Brizuela, was at the Cobb address. Brizuela had felony arrests, including a 2009 Kern County arrest for selling methamphetamine. During surveillance at the Cobb address, a second male Hispanic was seen with the previously mentioned male Hispanic.

On October 22, 2012, the Milling house was rented. On October 23, 2012, deputies executed a search warrant at the Cobb address. The black Honda was parked in front of the Cobb address. The Cobb address had been recently vacated, but video cameras had been installed there and there was evidence marijuana had been cultivated there.

During November 2012, the black Honda was parked in an open garage at the Milling address. Another vehicle was parked in the driveway and Brizuela was standing near the garage with the previously mentioned second male Hispanic. Based on the information in the affidavit, Woods believed Brizuela resided at the Milling address and was possessing, trafficking in, and/or manufacturing, narcotics. Woods opined Brizuela

19

was selling methamphetamine from her residence and opined she was storing additional methamphetamine, and proceeds from methamphetamine sales, at the Milling address. Woods asked that a search warrant be issued commanding a search of the Milling address.

On February 1, 2013, Cangas joined in Brizuela's motion. The trial court indicated it would read the sealed *Hobbs* attachment to the search warrant. On February 20, 2013, the court indicated it had read the moving papers, search warrant, and the *Hobbs* sealed attachment. The court denied the motion to quash and/or traverse the search warrant.

Cangas asks this court to review the sealed *Hobbs* attachment to the supporting affidavit and determine if the entire affidavit sets forth probable cause to issue the warrant. We have reviewed the nonconfidential portions of the warrant and supporting affidavit, as well as any and all sealed material pertaining thereto, including the *Hobbs* attachment. We are satisfied the trial court acted within its sound discretion by denying the motion to quash and/or traverse the warrant, because it was not reasonably probable Cangas could prevail on said motion. (Cf. *Hobbs, supra,* 7 Cal.4th at pp. 974-977.)

7. *No Instructional Error Occurred as to Count 1, 3, or 6 as to Ozuna.*

The jury convicted Ozuna of the substantive offenses of possession of a controlled substance for sale (count 1), possession of a firearm by a felon (count 3), and false compartment activity (count 6). The jury made special findings as to each of counts 1 and 6, that Ozuna was guilty under a conspiracy theory (see fn. 1, *ante*) and, inter alia, he conspired to sell methamphetamine in violation of Health and Safety Code section 11379. As to count 3, the court gave the jury a general verdict form that did not permit the jury to make special findings concerning guilt under a conspiracy theory, and the jury convicted Ozuna on count 3 pursuant to a general verdict.

20

Ozuna claims his convictions on counts 1 and 6 must be reversed because the trial court erroneously failed to instruct Wharton's rule rendered the theory he conspired to sell methamphetamine legally invalid, thereby precluding his vicarious liability for any coconspirator's possession of a controlled substance for sale (count 1) and for any coconspirator's false compartment activity (count 6). We reject the claim.

Wharton's rule states: " 'Where the cooperation of two or more persons is necessary to the commission of the substantive crime, and there is no ingredient of an alleged conspiracy that is not present in the substantive crime, then the persons necessarily involved cannot be charged with conspiracy to commit the substantive offense and also with the substantive crime itself.' " (*People v. Johnson* (2013) 57 Cal.4th 250, 265 (*Johnson*).) " 'The classic Wharton's Rule offenses—adultery, incest, bigamy, duelling—are crimes that are characterized by the general congruence of the agreement and the completed substantive offense.' " (*Ibid.*)

Wharton's rule " 'is considered in modern legal thinking as an aid in construction of statutes, a presumption that the Legislature intended *the general conspiracy section* be merged with the more specific substantive offense. [Citation.]' [Citations.] " (*People v. Lee* (2006) 136 Cal.App.4th 522, 530 (*Lee*), italics added.) The general conspiracy section is Penal Code section 182, subd. (a)(1). (*Id.* at pp. 526, 530; *People v. Tatman* (1993) 20 Cal.App.4th 1, 5, 7, 9.) Section 182, subdivision (a)(1) pertains to conspiracies to commit any crime. Wharton's rule is founded on the notion "legislative intent is paramount in determining whether a party can be *prosecuted for conspiracy* in a given situation." (*Lee*, at p. 530.)

Wharton's rule is inapplicable in the present case. The rule applies, if at all, only when a defendant is charged with (1) conspiracy as a crime (e.g., under the general conspiracy section of Penal Code section 182, subdivision (a)(1)) and (2) the substantive offense that was the target of that conspiracy. However, first, Ozuna was neither charged with, prosecuted for, nor convicted of, conspiracy as a crime. He was neither charged with, nor convicted of, conspiracy to sell methamphetamine. The conspiracy language in

21

the jury instructions as to counts 1 and 6 did not pertain to a separate crime of conspiracy but to a theory of conspiratorial liability for the crimes of possession of a controlled substance for sale (count 1) and false compartment activity (count 6), the crimes of which Ozuna was convicted.

Second, the substantive offense that was the target of the conspiracy referred to in the conspiracy language of the instructions pertaining to counts 1 and 6 was selling methamphetamine. However, Ozuna was neither charged with, nor convicted of, the substantive offense of selling methamphetamine.

Third, even if Wharton's rule was otherwise applicable in this case, the rule is inapplicable where, as here, the conspiracy under review is likely to generate additional conspiracies. (*Johnson, supra*, 57 Cal.4th at pp. 265-266.) For example, in the context of the narcotics sales operation presented in the instant case, a conspiracy to sell methamphetamine would likely generate additional conspiracies to possess methamphetamine for sale, to possess methamphetamine with a firearm, and/or to engage in false compartment activity.

A similar analysis applies to Ozuna's claim his conviction on count 3 must be reversed because the trial court erroneously failed to instruct Wharton's rule rendered the theory he conspired to sell methamphetamine legally invalid, thereby precluding his vicarious liability for any coconspirator's possession of a firearm. The trial court did not err by failing to instruct on Wharton's rule as to count 1, 3, or 6, because the rule was inapplicable to those counts.

8. *The Trial Court Properly Denied Ozuna's Romero Motion.*

Ozuna's probation report reflects he was born in 1974 and committed various juvenile offenses.[10] Ozuna suffered the following adult convictions: 1990 convictions for second degree robbery and a violation of Penal Code section 273.5, subdivision (a) (matters as to which he was arrested as a juvenile, but charged and convicted as an adult); two June 30, 1998 convictions (based on December 11, 1997 arrests) for violations of Penal Code section 245, subdivision (a)(1) (case No. MA012826), resulting in a nine-year prison sentence; and 2008 convictions for corporal injury (Pen. Code, § 273.5, subd. (a)) and drunk driving (Veh. Code, § 23152, subd. (b)), resulting in a four-year prison sentence and a misdemeanor jail sentence, respectively.

On July 12, 2013, Ozuna asked the court to strike both of his strikes pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*). The strikes were the two 1998 convictions for violations of Penal Code section 245, subdivision (a)(1) (case No. MA012826). He argued the strikes were a little over 15 years old, his contact with the justice system was not the most serious, and the current case was a drug case. The People opposed the request, noting the current case was gang-related and involved a gun, Ozuna had not led a crime-free life, including after the strikes, and the current offenses were strikes. The court denied Ozuna's request. The court sentenced Ozuna to a total prison term of 28 years to life, consisting of, as to count 1, 25 years to life pursuant to the Three Strikes law, plus three years for the gang enhancement. The court also imposed prison sentences of 28 years to life on each of counts 3 and 6, and stayed those sentences pursuant to Penal Code section 654.

---

[10] Ozuna committed the following juvenile offenses: (1) in 1990, throwing a substance at a vehicle (Veh. Code, § 23110) and vehicle theft (Veh. Code, § 10851); (2) in 1991, vandalism (Pen. Code, § 594, subd. (b)); and (3) in April 1991, two separate burglaries. Each of the above three enumerated offenses (except one of the burglaries) resulted in camp placement. In 1992, Ozuna committed grand theft (Pen. Code, § 487h, subd. (a)), vehicle theft (Veh. Code, § 10851), receiving stolen property (Pen. Code, § 496), and possession of burglar tools (Pen. Code, § 466), resulting in placement in the California Youth Authority.

Ozuna claims the trial court abused its discretion by denying his *Romero* motion as to one of his strikes. We disagree. The court presided at Ozuna's jury trial on the present offenses and at his court trial on the prior conviction allegations. The court heard argument of counsel on the *Romero* motion. In light of the nature and circumstances of Ozuna's current offenses and the strikes, and the particulars of his background, character, and prospects, we hold the trial court properly exercised its discretion by denying Ozuna's *Romero* motion. (Cf. *People v. Williams* (1998) 17 Cal.4th 148, 158-164; *People v. DeGuzman* (1996) 49 Cal.App.4th 1049, 1054-1055; *People v. Askey* (1996) 49 Cal.App.4th 381, 388.)[11] We note Ozuna concedes the assaults underlying the strikes were committed against different victims; the fact, if true, Ozuna committed those assaults during a single incident does not affect our holding.

---

[11] Respondent concedes Ozuna's abstract of judgment must be corrected to reflect his conviction on count 6 was for false compartment activity and not, as the abstract currently and erroneously reflects, for conspiracy to commit a crime. We accept the concession and will direct the trial court to correct Ozuna's abstract of judgment accordingly. (Cf. *People v. Humiston* (1993) 20 Cal.App.4th 460, 466, fn. 3.)

*DISPOSITION*

The judgments of appellants are affirmed. The trial court is directed to forward to the Department of Corrections and Rehabilitation an amended abstract of judgment as to Ozuna reflecting his conviction on count 6 was for false compartment activity.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

EDMON, P. J.

ALDRICH, J.

25